# Webb, *et al. v.* McFarlin & Co., *et al.*

## *Action on Injunction Bond.*

(Decided December 21, 1911. Rehearing denied May 1, 1912.
58 South. 453.)

1. *Injunction; Wrongful Injunction; Damages.*—The measure of damages of lessees of a mining property for being wrongfully prevented by injunction from engaging in mining operations for twelve days, they resuming operations after that time, was the value of the lease during the period of suspended operation, to be determined from a consideration of all the facts, and not the net profit which they would have realized on the sale of ore taken from the land during such time.

2. *Same.*—Prospective profits cannot be allowed as items or elements of damages in an action on an injunction bond for damages arising from being forced to suspend a mining operation.

3. *Same.*—In arriving at the net profit which would have been realized by a mining company during the time it was required by injunction to suspend the mining of ore, allowance must be made for any "dead work" necessarily required to be done in the way of providing the facilities necessary in mining and transporting the ore.

4. *Same; Action on Bond; Evidence.*—The evidence examined and held insufficient to support a finding as to the amount of ore that would have been mined, or the profit that would have been realized from its sale, but for the injunction.

5. *Same.*—Where the lessees bring an action on an injunction bond against the lessors for enjoining mining operations, and the lessors proved failure of the lessees to mine and transport the ore in accordance with the directions of their engineers, as required by the

lease, it was competent for them to prove also the damages resulting to them from such failure.

6. *Same; Decree; Effect.*—A decree for the lessees in a suit by the lessors to enjoin the lessees from continuing mining operations under the lease because of alleged breach of its conditions merely settled the rights of the parties under the lease contract up to the time of trial, and not their rights accruing thereafter.

7. *Mines and Minerals; Lease; Construction.*—Where the lease provided that the ore shall be mined and transported in a practical and uniform manner, and as directed by the lessors and their engineers, and not otherwise, the lessees could not mine and transport the ore contrary to the directions of the lessors or their engineers, though such directions were impractical; their remedy being in such case to abandon the lease.

8. *Same; Waiver of Condition.*—The provisions of a mining lease that the lessors might terminate it upon failure of the lessees to perform certain conditions were for the benefit of the lessors and could be waived by them.

APPEAL from Birmingham City Court.

Heard before Hon. CHARLES W. FERGUSON.

Action by Will McFarlin & Company, against Christina S. Webb and others on an injunction bond. Judgments for plaintiffs and respondents appeal. Reversed and remanded.

The following is the contract referred to in the opinion:

The State of Alabama, Jefferson County.

This agreement made and entered into on this the 1st day of January, 1903, by and between Norman Webb and his wife, Christina Webb, and Sterling A. Wood and his wife, Ida May Wood, parties of the first part, and Will McFarlin & Co., parties of the second part, witnesseth as follows:

That the said parties of the first part, for the consideration hereinafter named, do hereby agree and bind themselves as follows:

A. To lease unto the said parties of the second part the right and privilege of mining and selling the iron ore upon and from the following described premises, that is to say:

(1) That part of the northeast quarter of the south-west quarter of section six (6), township eighteen (18), and range two (2) west, that lies and is situated south of Twentieth Avenue South, as plotted on the map of Webb & Wood's South Highland subdivision of Birmingham, Alabama:

(2) That part of the northwest quarter of the south-east quarter of the southwest quarter of said section, township and range, in Parton's Gap, on Red Mountain, that contains iron ore:

But subject, however, to the following reservations:

All that part of the said premises that is used by the said Sterling A. Wood as his residence, or accessory to the same, is reserved from this lease until he removes therefrom, not exceeding six months from this date; and all mining operations conducted on said part of said premises during said term are to be conducted as directed by him, and not otherwise, during his residence thereon.

B. To put and sustain the said parties of the second part in the quiet and undisturbed possession of the said premises, to the extent herein and hereby granted to them, for and during the term herein mentioned.

C. That the said parties of the second part shall have the right to use any of the surface of the said premises to the extent that may be necessary to mine and carry away the said ore, as provided in this contract, and shall have the right to remove any trees that may be in the way of mining the said ore by stripping or tunneling.

D. That said parties of the second part shall have the right to construct a tramway or tramways over the said premises for the purpose of delivering the said iron ore at and on the track of the Birmingham Mineral Railway.

E. That the said parties of the second part may construct a commissary, blacksmith shop, or other business building on the said leased premises, at such points as may be designated by the parties of the first part; but whenever the said parties of the second part shall cease mining under this contract, or this contract shall end and determine by its provisions, said buildings shall belong to the owners of the land upon which the same are situated.

F. That said parties of the first part shall have the right to cancel and annul this contract if the said parties of the second part shall:

(1) Fail or refuse or neglect to make payments for rayalty for said iron ore mined and taken from said premises, or the minimum amount—in default of mining and taking ore from the said premises—as herein provided for, at the time and to the amount herein stipulated; or

(2) Fail or refuse or neglect to mine the said iron ore in the manner herein provided; or

(3) Trespass upon the said premises or go thereon otherwise than is herein provided; or

(4) Continue to violate any of the other provisions of this contract after thirty days' notice to cease same; or

(5) Sublet this contract without the written consent of the parties of the first part; or

(6) Violate in any manner paragraph 12 of the agreements of the parties of the second part.

G. That the said parties of the second part have the right to the use of the five-room cottage on the said forty-acre tract and the one-room cottage on the ten-acre tract during the continuance of this lease from the time said Wood removes from said premises, not exceeding six months from this date.

H. That the said parties of the second part have the option to end this contract on ninety days' notice.

And the said parties of the second part do hereby agree and bind themselves as follows:

1. That they will commence work upon the said premises within thirty days from this date, and beginning six months from this date shall mine and take from the said premises not less than fifteen hundred tons of iron ore per month, or, in default thereof, pay the royalty hereinafter named upon the said amount of ore at the time herein mentioned in like manner as if the same had been mined and taken from the said premises under the provisions of this contract, unless, within six months previous to such default, they shall have mined ore and taken the same from the said premises in excess of said 1,500 tons per month, in which case they are entitled to credit to the extent of such excess, upon stating accounts, so as to pay royalty upon only 1,500 tons per month but they shall have the right, for six months after paying any such unearned royalty, to recover the same and regain credit therefor by mining ore and taking same from said premises, in excess of said 1,500 tons per month, to the extent of such excess.

2. That they will keep a separate account of the said iron ore mined on said first named parcel of property from that mined on said second named parcel of property, and render separate account for same as may be directed by said parties of the first part and shall not, on thirty days' notice to cease doing so, mine to a greater extent from one than from the other tract of said land.

3. That the parties of the first part shall have the right and privilege of inspecting the mining books of

the parties of the second part at any time they may demand the same.

4. That they will mine and transport the said iron ore in a practical and uniform manner, as may be directed by the engineer in charge of the interests of the parties of the first part, and not otherwise.

5. That they will mine all of the said iron ore on the said premises as soon as practicable, continuously and without unnecessary delay.

6. That they will not remove from said premises any machinery, tram rails, tipples, chutes, or other material that may be used in mining on the said premises, nor sell or otherwise dispose of the same, until all of the said iron ore shall have been mined and taken therefrom as herein stipulated; and if they should cease mining, or this contract end and determine before all of the said iron ore is mined and taken therefrom, the said parties of the first part shall have the right to use the said property mentioned for the purpose of mining the remaining part of the said iron ore and until the same is mined.

7. That they will pay the sum of twenty cents per ton as royalty for all of the iron ore mined and taken from the premises, and that they will pay the additional sum of five cents per ton as royalty for all of the iron ore mined and taken from the said second named premises, said ten-acre tract, as compensation for the destruction of the improvements thereon; and on notice the amount due for said royalty shall be retained by the purchaser of the said ore, and paid direct to the parties of the first part as their property.

8. That they will pay the sums mentioned as the said royalties on the 25th day of the month succeeding the mining and taking of the said iron ore from the said premises.

9. That they will construct and maintain in a sanitary condition privies on the said premises wherever designated by the parties of the first part sufficient for the laborers thereon.

10. That they will place and dump all refuse material at the point or points designated by the parties of the first part, if practicable under the judgment of the parties of the second part, with the view of making the said premises suitable for residences after the said iron ore shall have been mined and taken therefrom.

11. That they will maintain, if practicable, in a passable condition, the roadway leading to the said Redmont cottage, at the point where the same passes immediately through the gap, known as Parton's gap; and for ———months from the date of this contract will not undermine that portion of said roadway immediately in rear of said cottage, so as to obstruct the same.

12. That they will use great care and diligence to protect the property or persons on the land covered by this lease from any injury or damage.

13. That they will preserve the springs adjoining said premises from pollution in so far as they are able to do.

And it is further understood and agreed by the said parties to this contract:

1. That the word "ton," when and wherever used in this contract, shall mean 2,240 pounds.

2. That this contract shall cease and determine on the 31st day of December, 1908.

3. That the word "iron ore," when and wherever used in this contract, shall mean all of the iron ore on the said premises, including the vein known as the Irondale vein, that it is practicable to mine, and which is suitable for the market.

4. That the word "premises," when and wherever used in this contract, shall mean the said leased parcels of land, with the reservations mentioned in this contract.

5. That the words "cease mining," when and wherever used in this contract, shall mean the stopping of mining operations on said premises for the period of ninety days.

6. The payments provided for in this contract are to be made to said Norman Webb and said Sterling A. Wood, and the notices mentioned shall be given by either of them.

7. That all agreements and warranties in this contract made by the parties of the first part, and any and all liability arising therefrom, are made and exist only to the extent of the interest in or title to the said premises as owned respectively by the said parties.

In witness whereof, we have hereunto set our hands and seals the day and date above written. Signed in quadruplicate.

Norman Webb,          [Seal] 1
Christina S. Webb,     [Seal] 2
Sterling A. Wood,      [Seal] 3
Ida May Wood,          [Seal] 4
          Parties of the first part.
Will McFarlin & Co.   [Seal] 5
     By W. McF.
          A firm composed of James Mc-
          Farlin and Will McFarlin.
          Parties of the second part.

Witnesses as to 1 and 2:
     J. A. Dickinson.
     J. H. Wallace.
Witness as to 3 and 4:
     J. A. Dickinson.
Witnesses as to 5:

[Webb, et al. v. McFarlin & Co., et al.]

For and in consideration of one dollar in hand paid to me by the parties of the first part, I hereby guarantee the payments for iron ore as set forth in this lease.

Chas. J. Smith.

W. C. WARD, E. K. CAMPBELL, Z. T. RUDOLPH, and A. LEO OBERDORFER, for appellant. The rule laid down in the case of *First Nat. Bank of Talladega v. Chaffin, et al.,* 118 Ala. 246, is the true rule as to the admission of illegal evidence where the case is tried by a judge without the jury.—*Laland v. Brown,* 121 Ala. 515; *Miller v. Mayer,* 124 Ala. 439; *Black v. Pate,* 130 Ala. 527. The court should have granted a continuance on account of the absence of Mr. Wood's personal counsel on account of sickness.—1 McLean 334; 41 Cal. 626; 5 Ill. App. 625; 4 Ind. App. 288; *Ala. S. & W. Co. v. Wrenn,* 136 Ala. 490. The construction placed upon the contract by the parties may be looked to by the court in determining their intention.—*Gaines v. V. & A. Coal Co.,* 124 Ala. 394. The reasonable construction of the contract is that the ore should be mined as directed by the lessors or their engineers, it must be mined and transported that way, and if that is imprac-tical, then the remedy of the lessee is to abandon the contract. The only damage is the value of the lease during the time the operations were stopped, and not the profits of the lease during the time the operations were stopped, and not the profits that might have been earned by the mining of the ore.—41 South. 332; *So. Ry. v. Coleman,* 153 Ala. 266; *Sparks v. McCrary,* 47 South. 333; *Worthington v. Gwin,* 119 Ala. 44; *Bixby-Theisen v. Evans,* 57 South. 41.

TILLMAN, BRADLEY & MORROW, HICKMAN & HAM-MILL, and ROY M. STERNE, for appellee. The expenses

allowed were recoverable.—*Jackson v. Milspaugh,* 100 Ala. 285; *Bush v. Kirkbride,* 131 Ala. 409; 32 Hun. 497; 15 Fed. 32. The declaration of an agent is not admissible to bind his principal.—*Bessemer C. & I. & L. Co. v. Doak,* 44 Ala. 687. The cost of the mining and transporting the ore was shown and the price per ton was shown, and hence, the damages recovered on these items were neither speculative nor uncertain.—*Metzger v. Brincat,* 45 South. 633; *Watson v. Kirby,* 112 Ala. 46. Counsel discuss other assignments of error, but without citation of authority.

MAYFIELD, J.—This is an action on an injunction bond.

Appellants were the owners of 50 acres of land on Red Mountain, about two miles south of the central part of the city of Birmingham. The property was considered valuable chiefly for two reasons—one, its adaptability for suburban residence sites, and the other, its deposits of iron ore. One of the appellants had his residence upon the property. For the purpose of utilizing the iron ore and preparing the land for permanent residence property, appellants entered into a lease contract with appellees, by which the appellees acquired the right to mine and sell all the marketable iron ore upon the premises. The reporter will set out this contract in full. The appellees had five years in which to mine and sell the ore. They were to pay appellants a royalty of about 20 cents per ton for all ore mined and taken from the land, and were required, after the first six months, to mine at least 1,500 tons per month, or, in default therein, to pay the royalty upon that amount, in the manner and at the times the royalty would have been paid had 1,500 tons of ore been mined. The contract provided, among other

things, that: "All that part of the said premises that is used by the said Sterling A. Wood as his residence, or accessory to the same, is reserved from this lease until he removes therefrom, not exceeding six months from date; and all mining operations conducted on said term are to be conducted as directed by him, and not otherwise, during his residence thereon. * * * That they (appellees) will mine and transport the said iron ore in a practical and uniform manner, as may be directed by the engineer in charge of the interests of the parties of the first part, and not otherwise," etc.

Appellees began operations under this contract soon after it was made in January, 1903, and continued so to do until the 23d day of April, 1903, when they were enjoined, at the suit of appellants, from further mining on said lands. The injunction was in force for only about 2 weeks, 12 working days, when it was dissolved, and appelleees went back to work under the contract. On the 24th day of July, 1903, appellees instituted this suit upon the injunction bond, claiming damages, general and special, as for costs and attorney's fees in defending the injunction suit or procuring the dissolution, for loss of time, for expenses on account of the injunction, and for the profits plaintiffs would have realized during said 12 working days but for the injunction. There were various motions to strike parts of the complaint, and demurrers thereto, unnecessary to be here considered, because the rulings thereon are not insisted as error in argument.

The appellants filed a great number of pleas to the complaint, in the nature of pleas of set-off or recoupment, claiming damages for various breaches of the mining contract, as set forth in the pleas. The case was tried upon these issues by the court without a jury, and a special finding of facts was made by the court,

and entered of record, as required by the statute. The trial resulted in a judgment for plaintiffs for $2,032— more than the amount of the bond, which was $2,000. From that judgment this appeal is prosecuted.

There are 149 assignments of error. It would be a needless consumption of time and space to attempt to treat separately each of those various assignments. We shall, therefore, treat them in a general way, stating the law, as we conceive it to be, upon which depend the rights of the litigants involved on this appeal. There is no doubt that the plaintiffs were entitled to recover in this action all the damages they sustained by reason of the suing out of the injunction, for this was warranted by the terms and conditions of the bond. Likewise, there is no doubt that the defendants were entitled to set off or recoup any damages they may have sustained by reason of breaches of the lease contract by the plaintiffs, if such breaches and damages were shown, as alleged in the pleas. In fact, this much is not denied by the parties to this appeal. The difference in the contentions of the parties goes to the kind, shown on the trial, by the respective parties. We find no reversible error on the part of the trial court as to the amount of damages shown by and allowed to the plaintiff, as for costs and expenses in defending the injunction suit, to the extent of procuring the dissolution of the injunction, in the way of attorneys' fees and other items. The trial court properly limited the damages as to these items, and, as to these matters, we find no error of which appellants can complain.

We are of the opinion, however, that the trial court committed reversible error in allowing the plaintiffs to recover, as for a separate and distinct item, the "prospective profits" which the plaintiffs could have made by the operation of the lease during the 12 days in

which they were enjoined from activity. While the plaintiffs were entitled to recover, as an element of damages, the value of their lease during this 12 days of suspension, such value is not to be measured, as the trial court permitted it to be measured, by the net profits which the plaintiffs could have realized from the mining and sale of ore during these 12 days but for the injunction. While the evidence of these facts was admissible, the net profit which could and would probably have been realized during these 12 days is not the value of the lease during such period. While at first thought it would appear to be the same thing, or to fall within the axiom that "things which are equal to the same thing are equal to each other," yet, on close examination, they are in this case found not to be the same, and not to be equal to the same thing. If the effect of the injunction had been to prevent the plaintiffs from performing or completing their contract, then the net profits that they would have realized would have been the value of their lease for the remaining time, and their prosepective profits, if capable of ascertainment, would be the measure of their damages; this being a contract of the kind in which profits may be recovered as an element of damages. But this was not the effect of the injunction in this case. The plaintiffs went on with the performance of their contract after the 12 days of suspension on account of the injunction. Of course, as before stated, they were entitled to recover whatever damages they sustained by reason of this suspension; but the net profit which they could have realized from the sale of ore taken from the land during that 12 days interim was not the proper measure of this item of damages; instead such measure was the value of the lease contract during such period of suspended operation. Suppose they could have com-

pleted the entire contract within those 12 days, but, on account of the suspension, it required 24 days to complete it; would it be contended that in this suit they could recover all the profits they would have made on the entire contract, plus the profits they did actually make, plus the costs, expenses, and loss of time incurred on account of the injunction? If so, the effect of the injunction would be to double their profits. Yet this is exactly what was done in this case, to the extent to which the contract was performed after the injunction was dissolved. As before stated, if the effect of the injunction had been to prevent the further performance of their contract, the rule would have been different. In that contingency the profits allowed would not be double.

The injustice of allowing prospective profits as a separate item of damages in this case is clearly shown by the special findings of the court and the judgment entered therefor. The profits are shown to have been arrived at by the court in the following manner (taken from the special findings of the court):

"* * * For loss of profits for 12 days the court finds as follows: That plaintiffs were mining daily from the 10 acre tract an average of 68 tons of ore and also an average of 68 tons from the 40-acre tract. The court finds the cost of mining and profits on each of said tracts as follows:

"The cost of mining on the 10-acre tract hauled by trams per tram:

| | | |
|---|---|---|
| Digging | $0 | 40 |
| Hauling | 0 | 075 |
| | $0 | 475 |

"One tram equals 1.7 tons, and the cost per ton was:

Hauling and digging ............................................................$0 277
For timber ............................................................ 0 015
Fixed expense, foreman & stable boss............................ $ 30
Royalty ............................................................ 0 25

$0 572

"Average selling price, with contracts for the entire output, 95 cents per ton, leaving a net profit of thirty-seven and eight-tenths cents ($0.378) per ton, or a daily profit on the 68 tons mined of $25.70.

"The cost of mining on the 40-acre tract hauled by wagons was per wagon:

Hauling ............................................................ $0 10
Digging ............................................................ 0 25

$0 35

"One wagon load equal 1.3 tons, and the cost per ton was:

For digging and hauling........................................$0 2691
Royalty ............................................................ 0 20

Total cost per ton........................................$0 4691

"Average selling price 95 cents per ton, leaving a net profit of $0.4809 (forty-eight and nine hundredth) cents per ton, or a daily profit of the 69 tons mined ............................................................$32 70

"Adding the daily profits on the other tract...... 25 70

$58 40

"Making a daily profit of $58.40, and multiplied by 12, the number of days the injunction was in force, making $700.80.

"The court finds that by estimate something over 300,000 tons of ore was left in the property after plaintiffs ceased work."

The evidence of the plaintiffs themselves showed that there had been theretofore necessarily done a great deal of "dead work" as it is called by them, in the way of digging "ramp," building side tracks, tramways, making entries, ventilating, propping mines, etc., which cost several thousand dollars, which was necessary to the performance of the contract, but of which no account whatever was taken by the court, in arriving at the profits which plaintiffs would have derived from the business but for the injunction. The undisputed evidence also showed that a great deal more work of the same kind would have to be done, in order to complete the contract, all of which would be expense, and not profit to plaintiffs, but which, of course, would have to be taken into consideration in determining the net profits to plaintiffs upon performance of the contract. That this prospective profit, as found, was grossly excessive, may be seen from the claims of the plaintiffs themselves, made before this suit was brought and when they were defending the injunction suit, and where, of course, they would state it as favorably as possible to themselves. In their answer to the bill in chancery, which they introduced in evidence on this trial, we find the following statement by them as to the contemplated and prospective profits: * * * That they have expended large sums of money in making their necessary preparations in which is commonly called 'dead work,' from which there had been no return. Among other things is the ramp constructed at large expense and in the construction of which no ore at all was obtained. The railroad track was also constructed at large expense, and only about 225 cars

have been shipped thereover. Defendants have made
contracts for the sale of their ore at profitable prices
with the different furnace companies in the Birming-
ham district. They have now contracts for the ship-
ment of about 9,000 tons of said ore per month at prices.
which will net them approximately 22 cents a ton in
profits.   *   *   *   Yet, under the rule followed by the
court, they are allowed a profit of $0.4809 per ton on
ore mined from the 40-acre tract and a profit of $0.388.
on that from the 10-acre tract. Under the rule follow-
ed by the court, the plaintiffs were allowed to recover
nearly or quite twice the amount per ton claimed by
them. While we do not mean to say that this claim
of the plaintiffs was conclusive against them, yet it.
does illustrate the error into which the court fell, in.
arriving at the net profits, in the failure to take any
account of the expenses incident and necessary to the.
"dead work" under the contract.

The trial court, we also find, erred in the construc-
tion placed upon some of the provisions of this partic-
ular lease contract. While the contract does provide—
as the trial court found—that the mining and trans-
porting of the ore should be done in a "practical and
uniform manner," yet it also provides that it shall be
done "as may be directed by the engineer in charge of
the interests of the parties of the first part and not.
otherwise." And, as to that part of the premises on.
which the defendant Sterling A. Wood resided, it pro-
vided that during his residence thereon, not to exceed.
six months, all mining operations should be conducted
as directed by him, and not otherwise.

Under this contract, it is certainly provided that.
both the mining and the transporting of the ore should
be done as directed by the owners or their engineers.
It is made to appear beyond a doubt that these pro-

visions of the contract were the cause of all the troubles and differences of the parties. It was claimed by the owners that the lessees refused and failed to mine and transport the ore "in a practical and uniform manner" as directed by the owners and their engineers, but, on the contrary, that they were merely robbing the land of the ore near the surface, which could be mined and transported easily and without much cost or expense, neglecting to mine that which was deep and difficult to get and to transport, and that they were thus destroying the value of the premises as a mining proposition, and, on account of the manner of mining and transporting the ore, were also damaging the premises for residence purposes. On the other hand, it was claimed by the lessees that the directions of the owners were not practicable nor feasible, but were unreasonable; that the method pursued by them (lessees) was in accordance with the contract, and that by it the mining was practical and uniform, as done by others in the Birmingham district. The trial court, it is true, found in accordance with the contention of the lessees. This the court could do only by ignoring the provisions of the contract providing that the work should be done by the lessees as directed by the owners or their engineers, and not otherwise. The mode of mining and transporting was certainly left to the selection and direction of the owners or their engineers, and not to the choice of the lessees or theirs. But it was found by the court that some of these directions of the owners' engineers were not practicable, and that the mode pursued by the lessees was practicable as compared with other mining operations in the Birmingham district. This might be true, yet it gave the lessees no right, under this contract, to mine and transport ore contrary to the directions of the owners or their engi-

neers. While the owners and their engineers should
not arbitrarily select or direct a method not practica-
ble, and would have no right to compel lessees to mine
under such conditions or directions, yet their relief or
remedy, in such event, was provided for in the contract.
They could refuse to perform, and abandon the con-
tract. They were not authorized, under this contract,
to disregard the directions of the owners' engineers and
to pursue their own mode, even though it was more
practicable and more advantageous to all parties, in-
cluding even the owners themselves. This was not the
contract, and to enforce the contract as it was enforc-
ed by the court was practically to make a new contract
for the parties which provided that the work should
be done in such a practical and uniform manner as
might be selected or adopted by the lessees, instead of
in the method prescribed by the lessors or their engi-
neers.

The contract also expressly provided that the lessors
might terminate the same upon the failure of the lessees
to perform certain conditions of the agreement, among
which were the stipulations to mine the ore in the man-
ner stated, and not to go upon the land otherwise than
was provided in the contract, and to cease violating
(after thirty days' notice to do so) any of the other
provisions of the contract, binding the lessees and by
them being broken. These, however, were conditions
in favor of the lessors, matters which they could waive
if they so desired.

It is true the record shows they had brought suits
to enforce these provisions and failed therein; but these
suits settled merely the rights of the parties under the
contract, up to the time of the trial of the suits, and
not their rights accruing subsequent to such time. The
engineer, Reilly, was not employed until after these

first suits to terminate the lease were brought. His directions as to the mode of mining and transporting the ore, in many respects, the evidence indisputably shows the lessees declining to follow. It is true, as found by the trial court, the evidence did not show with much certainty or accuracy the amount of damages which the lessors suffered by reason of the lessees' failure to perform their part of the contract; but this was no doubt partly due to various rulings adverse to the lessors in the admission of proof on the part of the lessees, and in the rejection of evidence offered by the lessors to show the extent and amount of such damages. A number of these adverse rulings were erroneous, owing to the construction placed upon the contract by the trial court; and some, of course, owing to the ruling of the court that the plaintiffs were entitled to recover the net profits upon all the ore they could have mined during the 12 days in which the injunction was in force.

The lessors having proved that the lessees failed and refused to mine and transport the ore in accordance with the directions and instructions of the engineers, it was thereupon competent for them to prove, if they could, that the damages which resulted to them from the failure of the lessees to conform to the orders, and from their mining and transporting ore in a mode different from that prescribed by the engineers. The trial court allowed some evidence offered for this purpose, but rejected some which was clearly competent.

It would extend this opinion to too great a length to attempt to discuss each of these various adverse rulings, reaching, as they do, into the hundreds.

The chief errors of the trial court, in so far as the trial upon the pleas of set-off and recoupment is concerned, were due to or resulted from the erroneous con-

struction or interpretation of the lease contract. The trial court repeatedly held, and so found, that the lessees had the right to mine and transport the ore as they pleased, provided the mode was in accordance with practical and uniform mining in the Birmingham district, and notwithstanding the engineers had directed that it be done in a different mode from that pursued. We do not decide that the lessees were bound to mine and transport the ore in the mode directed by the engineers if this was not practicable; but it was certain that they were not authorized to mine it in a manner different from that directed, although the method pursued was practical and uniform. The contract, as before shown, repeated and emphasized the condition that the ore should be both mined and transported in the manner directed by the lessors' engineers, "and not otherwise." It may be that the contract is harsh in its requirements of the lessees, but the parties to it are sui juris, and there is no claim that any party was imposed upon or overreached, in its execution. It must be construed and enforced as it is written.

The only rights the plaintiffs claim in or to the ore or the premises depends upon this contract. But for the contract they would be trespassers in all things done upon the premises. Their suit and their rights depend entirely upon the contract, and, of course, they must be bound by its terms and conditions, if they would seek to bind the lessors by it. The lease contract is peculiar, special, and different from others because of the fact (indisputably shown by the contract itself and by all the evidence) that the property was valuable both as mining property and as suburban residence property. The law as to the measure of damages upon injunction and attachment bonds is well settled in this state. As before stated, the trial court seems to have

ruled and found correctly as to the items of damages, costs, and expenses of defending the injunction suit, including loss of time, services, etc.; but to have ruled and found incorrectly as to allowing prospective profits which might have been realized during the 12 days suspension but for the injunction.

Mr. High in his work on Injunctions (vol. 2, §§ 1663, 1664), says: Section 1663: "In estimating damages sustained by the improper issuance of an injunction, the courts proceed upon equitable grounds, and while it is difficult to fix any precise rule or standard for determining the damages upon dissolution, it may be said generally that nothing will be allowed which is not the actual, natural and proximate result of the wrong committed. * * . *" Section 1664: "As illustrating the rule limiting the damages recoverable to those which are the direct and immediate result of the injunction, to the exclusion of merely conjectural and speculative damages, it is held, where an injunction restrains the extension of a line of street railway, that, upon its dissolution, damages resulting from the possible profits which might have accrued, had the railway been extended, cannot be allowed. * * *" This court has stated the rule thus as to such damages: "Among the general rules for the recovery of damages are the following: That they must be the natural and proximate consequence of the wrong done, not the remote, or accidental result. And special damages can be recovered only when they are not too remote, and are specially counted on and claimed in the complaint. What are termed speculative damages—that is, possible or even probable profits that, it is claimed, could have been realized but for the tortious act or breach of contract charged against defendant—are too remote and cannot be recovered.—*Culver v. Hill*, 68 Ala. 66

[44 Am. Rep. 134]; *Donnell v. Jones,* 13 Ala. 490 [48 Am. Dec. 59]; *O'Grady v. Julian,* 34 Ala. 88; *Bolling v. Tate,* 65 Ala 417 [39 Am. Rep. 5]; *Sims v. Glazener,* 14 Ala. 695 [48 Am. Dec. 120]; *Burton v. Holley,* 29 Ala. 318 [65 Am. Dec. 401]; *Higgins v. Mansfield,* 62 Ala. 267." *Pollock v. Gantt,* 69 Ala. 377, 44 Am. Rep. 519. In the case of *Brigham v. Carlisle,* 78 Ala. 248, 56 Am. Rep. 28, it is said: "But there are damages which are in the contemplation of the parties at the time of making the contract, and are the natural and proximate results of its breach, which are not recoverable. The parties must necessarily contemplate the loss of profits as the direct and necessary consequence of the breach of a contract, and yet all profits are not within the scope of recoverable damages. There are numerous cases, however, in which profits constitute, not only an element, but the measure of damage. While the line of demarcation is often dim and shadowy, the distinctive features consist in the nature and character of the profits. When they form an elemental constituent of the contract, their loss the natural result of its breach, and the amount can be estimated with reasonable certainty, such certainty as satisfies the mind of a prudent and impartial person, they are allowed. The requisite to their allowance is some standard, as regular market values, or other established data, by reference to which the amount may be satisfactorily ascertained. Illustrations of profits recoverable are found in cases of sales of personal property at a fixed price, evictions of tenants by landlords, articles of partnership, and many commercial contracts."

It will be observed that the lease contract in this case falls within the mentioned class in which profits may be recovered as an element of damages; and, as before stated, on first impression it would seem that such

profits are recoverable in this action. But on closer examination they are found not to be recoverable, for the reasons assigned: First, the effect of the injunction or the wrong complained of, in this case, was not to prevent a performance of the contract but only to interrupt, retard, or impede its performance. The contract by its terms extended over a period of five years, while the effect of the injunction prevented performance for only 12 days, and work was resumed and continued thereafter. If the effect, however, had been to prevent performance, the net profits could have been properly ascertained only by subtracting the entire costs of performance from the gross receipts; and in this case there was no attempt to ascertain the entire costs and the gross receipts, but merely the costs and receipts during the 12 days of suspension of work. Moreover, the profits in this particular case could not be ascertained or made certain, because of the particular and peculiar provisions of the contract. As before shown, the contract provided that the work should be done in manner directed by the owners' engineers and not otherwise, and the proof all showed that it was not done in this manner. The lessees admit that they declined and refused to perform in the manner directed by such engineers. It is true that the lessees claimed that they were complying with the contract, and that the trial court so found, but, as we have shown, they and the court were in error in this contention and finding. It may be that the injunction suit was conclusive as to the question of their violating the contract up to and including the day the suit was dismissed; but it was certainly not conclusive as to violations occurring after the dismissal of the suit.

This case illustrates the correctness of the rule which disallows prospective profits as items or elements of

damages. This record shows that the court found that the lessees would have mined 1,632 tons of ore during the twelve days in which the injunction was in force, and yet the plaintiffs' own evidence and the findings of the court show that they mined only 1,979 tons during the next six months. The plaintiffs' own evidence shows that their expenses during the first year's operation of the lease, which included the twelve days in question, were largely in excess of the gross receipts, yet, under this rule of allowing prospective profits, the court finds (and the evidence supports the finding if such profits were recoverable) that plaintiffs would have made a net profit on each of those twelve days of $58.40, making a total net profit, for the 12 days, of $700.80, which rate of profit, if continued during the year, would have netted more than $16,000; while plaintiffs' own evidence shows that there were actually no profits during the first year's operation of the lease, but an actual loss instead. The correctness of the rule excluding prospective or contemplated profits is well stated by the Supreme Court of Michigan, and, as heretofore quoted by this court, the rule is as follows: "*  *  *  The profits of running a sawmill are proverbially uncertain, indefinite, and contingent. They depend on many circumstances, among which are capital, skill, supply of logs, supply and steadiness of labor; and one man may fail while another prospers, and the same man may fail at one time and prosper at another, though the prospective outlook seems equally favorable at both times. Estimates of profits seldom take all contingencies into the account, and are therefore seldom realized; and, if damages for breach of contract were to be determined on estimates of probable profits, no man could know in advance the extent of his responsibility. It is, therefore, very properly held in cases like

the present that the party complaining of a breach of contract must point out elements of damage more certain and more directly traceable to the injury than prospective profits can be."—*Moulthrop & Stevens v. Hyett & Smith,* 105 Ala. 496, 497, 17 South. 32, 34, 53 Am. St. Rep. 139. The case of *Coosaw Mining Co. v. Carolina Mining Co.* (C. C.) 75 Fed. 860, was very much like the one under consideration, a suit on an injunction bond, for that plaintiff had been enjoined from mining ore, and in which prospective profits were sought to be recovered as an element of damages, but they were disallowed; and the court said: "Of all operations in the world those mining ore are the most uncertain, even when the mineral bearing strata are or can be exposed to sight." The rules as to the measure of damages in cases like this is stated in 1 Sedgwick on Damages (8th Ed.) § 184, as follows: "Where the defendant by a malicious and unfounded injunction prevented the plaintiff from using its coal lands for a year, it was held that not only the nature and extent of the coal beds, but also the profit on possible sales of coal, might be shown, 'not in order to be allowed by the jury as profits, but to be treated as one of the facts that throw light upon the value of the rights taken.'" The case cited and referred to in the text was a case like this, except that the injunction prevented the mining of coal instead of iron ore; and as to the measure of damages the appellate court spoke as follows, approving the rulings of the lower court in that case: "By what rule should the damages be assessed? There being no market value of the rights taken from Upson and his associates, the only practicable rule for settling that value is to follow the ordinary common-sense practice of business men. Make known to the body charged with the assessment, as fully as legal evidence

[Webb, et al. v. McFarlin & Co., et al.]

can do it, all the facts that naturally and materially affect the value of the use of the rights of which the plaintiffs below were wrongfully deprived. These facts necessarily include the location, thickness, quantity, and value of the coal that was minable there and then; the facilities for transporting that coal to a market; the nature and extent of the demand for that coal; the total expense of placing it in the market (this included also all the preliminary expenditures); the competition with which they must contend; the contingencies in the demand and supply of labor; the relation of the 23 acres to other mining lands of Upson and his associates, for which they could use part, or all, of the same approaches; the total cost of the coal to them, and the prices for which it was salable during the period of the suspension; all these facts naturally affecting the value of the right to prosecute that business with that coal at and from that place during that time. No one of them is by itself a measure of the value. Considered together, some of them add to, others subtract from, the value; and then, after such a view, a common-sense judgment again subtracts a percentage for the contingencies that are ever presenting themselves in the affairs of men. Within these facts thus stated is the element of 'profit on possible sales of coal'; i. e., the difference between the cost of it and its market price. But it is there not as a measure of value; not in order to be allowed by the jury 'as profits,' but to be treated as one of a mass of facts that throws light upon the value of the use of the rights taken from Upson, all of which the jurors ought to have known and considered when computing the damages."—*Newark Coal Co. v. Upson,* 40 Ohio St. 25-26.

It appears from the terms of the lease in this case that plaintiffs, the lessees, were required to mine 1,500

tons of ore each month or to pay to the lessors a royalty as for that much whether mined or not. It also appears that up to the time of the issuance of the injunction that amount was actually mined. There was, therefore, evidence sufficient to make this a basis for the amount of coal that could or would have been mined during the 12 days that plaintiffs were enjoined from mining. There was also evidence that plaintiffs had contracts for the sale of this ore, which would have netted them 22 cents per ton profit. There was therefore evidence to have justified a finding by the court that this amount of ore would have been mined and would have been sold at a price that would have netted this amount of profit, which would measure the damages as to this element.

But, after a careful examination of this evidence more than once, we find none to justify or to support the special finding of the judge as to the amount of ore that would have been mined, but for the injunction, nor the amount of profits that would have been realized·from the sale of such ore but for the injunction. Nearly all the evidence refutes any such findings, as we have before pointed out.

For the errors pointed out in the opinion, the judgment of the lower court is reversed and the cause is remanded.

Reversed and remanded. All the Justices concur, save DOWDELL, C. J., not sitting.